A00A1254. GOLD KIST, INC. v. WILSON et al.

(542 SE2d 126)

ELLINGTON, Judge.

This is the fourth appearance of this case before this Court. The appellees, 15 farmers who were members of the Gold Kist, Inc. cooperative, brought suit after Gold Kist sold the egg processing facility which served them and assigned their production contracts to the purchaser. In *Gold Kist v. Wilson*, 213 Ga. App. 154 (444 SE2d 338) (1994) (*"Wilson I"*), we reversed the grant of summary judgment in favor of the farmers. Following a bench trial and entry of judgment in favor of the farmers, Gold Kist again appealed; we remanded for entry of findings of fact and conclusions of law. *Gold Kist v. Wilson*, 220 Ga. App. 426, 428 (1) (469 SE2d 504) (1996) (*"Wilson II"*). After the trial court entered findings of fact and conclusions of law explaining the judgment in favor of the farmers, Gold Kist appealed a third time. We affirmed the judgment in part, reversed in part, and

---

[9] *Vreugdenhill v. Navistar Intl. Transp. Corp.*, 950 F2d 524, 525-526 (8th Cir. 1991).

remanded the case with direction to enter a final judgment consistent with the opinion. *Gold Kist v. Wilson*, 227 Ga. App. 848 (490 SE2d 466) (1997) (*"Wilson III"*). Gold Kist now appeals the new final judgment entered after remand, contending the trial court exceeded the scope of its authority on remand and committed new error.

The farmers framed their complaint for damages in terms of both breach of contract and tort.

### Breach of Contract

When Gold Kist sold the processing plant to Hillandale Farms, Inc. in 1989, it paid the farmers their "notified equity" discounted to present value.[1] *Wilson III*, 227 Ga. App. at 850. In Count 2, the farmers alleged that Gold Kist breached the implied covenant of good faith in their production contracts by refusing to pay the farmers the full amount of their notified equity when it unilaterally ceased to do business with them. In Count 8, the farmers also sought an accounting on the basis that Gold Kist had not disclosed the costs and earnings associated with the sale of the farmers' eggs and pullets. The farmers alleged that, over the years of their contracts with Gold Kist, the amount disbursed to each farmer and the amount allocated on Gold Kist's books as each farmer's notified equity did not account for the full amount of the profits due each farmer.

In Count 3, the farmers alleged that Gold Kist breached its contracts with them by failing to pay the equity earned on the sale of their eggs and pullets in 1989 (the year Gold Kist sold the processing plant). The farmers further alleged that, because their production contracts were unassignable personal services contracts, they were entitled to recover from Gold Kist the amount they would have earned during the remainder of those contracts.

In Count 4, plaintiff James Crews asserted an individual breach of contract claim involving a contract he had with Gold Kist to produce eggs.

### Tort

The farmers also sued Gold Kist for fraud or "negligent advice" based upon alleged misrepresentations by Gold Kist's representatives. In Count 1, the farmers alleged that they borrowed and

---

[1] Gold Kist acted as the farmers' agent in selling their eggs. Profits generated by the sale of eggs were proportionately assigned to each farmer's equity account. *Wilson III*, 227 Ga. App. at 846, 849-851 (1). Under the parties' agreement, Gold Kist paid a portion of that sum to each farmer immediately and retained the remainder as "notified equity" for a lengthy period. Id. Farmers who terminated their membership in the cooperative were entitled to receive the amount in their notified equity accounts discounted to present value. Id.

invested large sums in building or remodeling chicken houses and purchasing equipment in reliance on Gold Kist's representation that it would operate the processing plant and do business with them long enough for the farmers to retire the debts secured by the chicken houses and equipment. They further alleged that the value of their chicken houses and equipment decreased substantially when Gold Kist sold the processing plant and assigned their contracts to Hillandale.

Count 7 alleged more generally that the parties were in a confidential relationship which required Gold Kist to act with the utmost good faith; that farmers sought and relied upon Gold Kist's advice regarding all aspects of their chicken operations including financial matters; and that Gold Kist failed to protect their interests.

In Count 5, plaintiff F. L. Murray, Jr. asserted an individual negligence claim alleging Gold Kist negligently recommended that he purchase certain inappropriate and unnecessary equipment.

### First Judgment

On July 14, 1995, the trial court entered judgment in favor of the farmers in varying amounts totaling $2,351,000. In the findings of fact and conclusions of law entered on October 15, 1996, to explain the judgment, the trial court construed the parties' agreements and concluded that the farmers were entitled to *all* of the profits from Gold Kist's sale of their eggs and pullets (after allowable deductions for vaccines, disinfectants, and other supplies Gold Kist provided to the farmers). In other words, the trial court found Gold Kist's "notified equity" practice was itself an ongoing breach of contract.

The trial court further found that even if Gold Kist had been entitled to retain some of the profits as "notified equity," Gold Kist should have paid the full "face value" (undiscounted amount) of each farmer's notified equity when it terminated its relationship with the farmers (Count 2). The trial court calculated the difference of each farmer's notified equity and the discounted amount paid when Gold Kist sold the processing plant. The trial court then calculated the farmer's share of the profits during the farmer's contract period with Gold Kist, an amount which "included" but differed from the farmer's unpaid notified equity.

With regard to Counts 3 and 4, the trial court concluded that the production contracts were unassignable personal services contracts. For farmers with contracts in effect at the time Gold Kist sold the plant, the trial court calculated as damages the amounts the farmers would have earned on those pending contracts (Count 3). The trial court also found in favor of James Crews on his individual breach of contract claim (Count 4). See *Wilson II*, 220 Ga. App. at 427; *Wilson*

*III*, 227 Ga. App. at 852 (3). In calculating the final award for each farmer, the trial court added any Count 2 damages (past profits) and any Counts 3 and 4 damages (contracts in effect at the time of the sellout).[2]

As to the negligent or fraudulent advice claims (Counts 1, 5, and 7), the trial court found the parties were in a confidential relationship. The trial court further found the farmers justifiably relied to their detriment on Gold Kist's representations as to its future plans which "amounted to negligent advice." The trial court awarded damages on the theories of fraud or negligent advice to only two farmers, Neil Hampton and H. J. Murray.[3]

### *Appeal of First Judgment*

On Gold Kist's appeal of the first judgment, we found no merit in Gold Kist's enumeration regarding the award in favor of Hampton and H. J. Murray on theories of fraud or negligent advice (Counts 1 and 7). *Wilson III*, 227 Ga. App. at 852-853 (4). Accordingly, that portion of the judgment was affirmed.

With regard to Gold Kist's purported assignment of pending contracts to Hillandale (Count 3), we held "[t]he trial court did not err in concluding that the production contracts between Gold Kist and the plaintiffs were unassignable personal services contracts." *Wilson III*, 227 Ga. App. at 852 (2). Accordingly, that portion of the judgment was also affirmed.

We disagreed, however, with the trial court's construction of the parties' agreements pertaining to profits (Counts 2 and 8). We held "that the trial court erred in concluding that plaintiffs were entitled to all of the profits from Gold Kist's sale of eggs and pullets." *Wilson III*, 227 Ga. App. at 851 (1). We further concluded "that the trial court erred in concluding that Gold Kist should have paid the full face amount of notified equity to plaintiffs." Id. at 851-852 (1). We specifically held "[n]either conclusion is authorized by the evidence presented at trial" and therefore reversed the judgment to the extent the judgment was predicated on those erroneous conclusions. Id. at 852 (1).

---

[2] The following farmers were awarded both damages for past profits and damages for pending contracts: James Crews, David Moody, Donald Morrison, F. L. Murray, Jr., Jimmy Thomas, Alfred Thomas, Renade Wilson, Linda Wilson as the administratrix of the estate of Melvin Wilson, and Winton Wilson. The following farmers were awarded damages only for their share of the past profits: Ned Hendrix, Lorna Thomas, and Wilson Brothers. The following farmer was awarded damages only for contracts in effect at the time of the sellout: Kenny Crews.

[3] The trial court made no award to plaintiff F. L. Murray, Jr. on his individual negligence claim (Count 5).

We also reversed with regard to the individual breach of contract claim of James Crews (Count 4). *Wilson III*, 227 Ga. App. at 852 (3).

We remanded with direction to enter final judgment consistent with our opinion.

## Second Judgment

In its order acting on this Court's direction on remand, the trial court stated that the original damages awards had made each plaintiff whole but that there were other bases of liability which each independently supported an award of the same damages. The trial court then "reaffirmed" its earlier awards based on three different theories. Gold Kist contends the trial court exceeded the scope of its authority on remand. We agree.

OCGA § 5-6-10 provides that after remittitur of an appealed case is returned to the trial court, "[t]he decision and direction [of the appellate court] shall be respected and carried into full effect in good faith by the court below." Where a judgment is reversed and the case is remanded to the trial court with direction, "it is the duty of the trial court in good faith to carry into full effect the mandate of this court." (Citations and punctuation omitted.) *Garner v. State*, 168 Ga. App. 523, 524 (310 SE2d 7) (1983). The rulings of our appellate courts are binding on the trial court in all subsequent proceedings in the case. *Palm Restaurant of Ga. v. Prakas*, 192 Ga. App. 74, 76 (383 SE2d 584) (1989).

Further, a trial court's authority to modify or amend its own judgments is limited by time. "[A]fter the expiration of the term at which a decree was entered, it is out of the power of the court to modify and revise it in any matter of substance or in any matter affecting the merits." (Citations and punctuation omitted.) *Holbrook v. Gen. Elec. Capital Corp.*, 196 Ga. App. 382, 384 (1) (396 SE2d 253) (1990). Trial courts do not have the authority to modify their judgments out of time even when the modification awards relief that a litigant would otherwise have been entitled to receive. See *Hughes v. Great Southern Midway*, 265 Ga. 94, 96 (2) (454 SE2d 130) (1995) (prejudgment interest). Even where a trial court has the authority to amend an earlier judgment nunc pro tunc, that power is limited to correcting "inadvertent errors or omissions in the record to reflect the truth of what happened." (Citation omitted.) *Ga. Tile Distrib. v. Zumpano Enterprises*, 205 Ga. App. 487, 492 (2) (422 SE2d 906) (1992). The trial court may not abuse that power by supplying "judicial omissions so as to include what a court might or should have decided, but did not actually so decide." (Citations and punctuation omitted.) Id.

By making additional findings of fact and conclusions of law and

entering judgment on a new calculation of damages, the trial court dramatically affected the merits of the case and failed to carry out the mandate of this Court. *Holbrook v. Gen. Elec.*, 196 Ga. App. at 384; *Palm Restaurant of Ga. v. Prakas*, 192 Ga. App. at 76. We again reverse and remand this case for entry of final judgment consistent with our decision in *Wilson III*, 227 Ga. App. 848.[4]

*Judgment reversed and case remanded with direction. Andrews, P. J., and Ruffin, J., concur.*

---

[4] For purposes of clarification, we note that damages awarded for the breach of contracts pending at the time of the purported assignment, affirmed in *Wilson III*, 227 Ga. App. at 852 (2), constitute lost future profits and, as such, should be discounted to present value. *Crosby v. Spencer*, 207 Ga. App. 487, 488 (2) (428 SE2d 607) (1993). See 22 AmJur2d Damages, § 647, p. 709 (1988); Robert L. Dunn, Recovery of Damages for Lost Profits, Vol. 1, § 6.25, pp. 501-502 (5th ed. 1998). In the event the trial court failed to discount to present value the award of such profits (to Kenny Crews, David Moody, Donald Morrison, F. L. Murray, Jr., Jimmy Thomas, Alfred Thomas, Renade Wilson, Linda Wilson as the administratrix of the estate of Melvin Wilson, and Winton Wilson), the trial court should modify those awards on remand. Assuming the lost profits awards in paragraphs 15 and 16 of the July 14, 1995 order already reflect the discount, the correct awards are obtained by subtracting the portion of each farmer's award (if any) awarded for past profits (reversed in Division 1 of *Wilson III*), and the breach of contract damages awarded to James Crews (reversed in Division 3 of *Wilson III*), and leaving the portion (if any) awarded for future profits (affirmed in Division 2 of *Wilson III*) or for negligent or fraudulent advice (paragraphs 17 and 18 of the July 14, 1995 order, affirmed in Division 4 of *Wilson III*), as follows:

| | |
|---|---:|
| James Crews | $ 0.00 |
| Kenny Crews | 151,000.00 |
| Neil Hampton | 237,000.00 |
| Ned Hendrix | 0.00 |
| David Moody | 245,134.00 |
| Donald Morrison | 133,975.31 |
| H. J. Murray | 148,000.00 |
| F. L. Murray, Jr. | 45,500.00 |
| Jimmy Thomas | 84,180.00 |
| Lorna Thomas | 0.00 |
| Alfred Thomas | 34,000.00 |
| Renade Wilson | 98,000.00 |
| Wilson Brothers | 0.00 |
| Linda Wilson (as administratrix of the estate of Melvin Wilson) | 61,000.00 |
| Winton Wilson | 61,000.00 |

With regard to postjudgment interest, we conclude that the portions of the original judgment which were upheld in *Wilson III* have remained unchanged since the entry of the original judgment on July 14, 1995. Accordingly, postjudgment interest should be calculated from that date. *CRS Sirrine, Inc. v. Dravo Corp.*, 219 Ga. App. 301, 304 (2) (464 SE2d 897) (1995). Cf. *Ga. Tile Distrib. v. Zumpano Enterprises*, 205 Ga. App. at 489-490 (2) (trial court erred in calculating postjudgment interest from earlier order where damages were determined and awarded for the first time after remand).

DECIDED NOVEMBER 3, 2000 —
RECONSIDERATION DENIED DECEMBER 1, 2000.

*Alston & Bird, Jay D. Bennett, Richard R. Hays, Kenneth D. Steele*, for appellant.
*Gibson & Spivey, Douglas L. Gibson*, for appellees.